<u>**PUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

────────────

**No. 15-1170**

────────────

JAMES HAYES; DEBERA GRANT; HERBERT WHITE, on behalf of themselves and others similarly situated,

Plaintiffs - Appellants,

v.

DELBERT SERVICES CORPORATION,

Defendant - Appellee.

--------------------------------

NATIONAL CONSUMER LAW CENTER; NATIONAL ASSOCIATION OF CONSUMER BANKRUPTCY ATTORNEYS; CENTER FOR RESPONSIBLE LENDING,

Amici Supporting Appellants.

────────────

**No. 15-1217**

────────────

JAMES HAYES; DEBERA GRANT; HERBERT WHITE,

Plaintiffs - Appellees,

v.

DELBERT SERVICES CORPORATION,

Defendant - Appellant.

--------------------------------

NATIONAL CONSUMER LAW CENTER; NATIONAL ASSOCIATION OF CONSUMER BANKRUPTCY ATTORNEYS; CENTER FOR RESPONSIBLE LENDING,

Amici Supporting Appellees.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond.   John A. Gibney, Jr., District Judge.   (3:14-cv-00258-JAG)

---

Argued:  December 9, 2015              Decided:  February 2, 2016

---

Before WILKINSON, KEENAN, and HARRIS, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Keenan and Judge Harris joined.

---

**ARGUED:** Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellants/Cross-Appellees.   Brian Jason Fischer, JENNER & BLOCK LLP, New York, New York, for Appellee/Cross-Appellant.  **ON BRIEF:** Deepak Gupta, Jonathan E. Taylor, GUPTA BECK PLLC, Washington, D.C.; Jennifer D. Bennett, Leah M. Nicholls, PUBLIC JUSTICE, P.C., Washington, D.C.; James W. Speer, VIRGINIA POVERTY LAW CENTER, Richmond, Virginia; Dale W. Pittman, THE LAW OFFICE OF DALE W. PITTMAN, P.C., Petersburg, Virginia; Leonard A. Bennett, Susan M. Rotkis, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Kristi C. Kelly, Andrew J. Guzzo, KELLY & CRANDALL, PLC, Fairfax, Virginia, for Appellants/Cross-Appellees.   Barry Levenstam, Daniel T. Fenske, Chicago, Illinois, Katya Jestin, Neil M. Barofsky, New York, New York, Julie M. Carpenter, R. Trent McCotter, JENNER & BLOCK LLP, Washington, D.C., for Appellee/Cross-Appellant.  Tara Twomey, NATIONAL ASSOCIATION OF CONSUMER BANKRUPTCY ATTORNEYS, San Jose, California; Geoff Walsh, NATIONAL CONSUMER LAW CENTER, Boston, Massachusetts; Ellen Harnick, CENTER FOR RESPONSIBLE LENDING, Durham, North Carolina, for Amici Curiae.

---

WILKINSON, Circuit Judge:

James Hayes, the lead plaintiff-appellant in this case, received a payday loan from a lender called Western Sky Financial, LLC. Defendant-appellee Delbert Services Corporation later became the servicing agent for Hayes's loan. Because Delbert's debt collection practices allegedly violated federal law, Hayes initiated a putative class action against Delbert. Claiming that Hayes and his fellow plaintiffs agreed to arbitrate any disputes related to their loans, Delbert moved to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. The district court granted Delbert's motion.

We both respect and appreciate the support of Congress and the Supreme Court for an arbitration procedure that reduces the costs and delays of civil litigation. Our review of the record leads us to conclude, however, that the arbitration agreement in this case is unenforceable. The agreement purportedly fashions a system of alternative dispute resolution while simultaneously rendering that system all but impotent through a categorical rejection of the requirements of state and federal law. The FAA does not protect the sort of arbitration agreement that unambiguously forbids an arbitrator from even applying the applicable law. We therefore reverse the district court's order compelling arbitration and remand for further proceedings.

This case originates with the lending practices of Western Sky. Western Sky was an online lender owned by Martin Webb. Webb was a member of the Cheyenne River Sioux Tribe, and Western Sky's offices were located on the Cheyenne River Indian Reservation in South Dakota. From its base on the Reservation, Western Sky issued payday loans to consumers across the country.

Hayes's loan typifies Western Sky's lending scheme. Western Sky issued Hayes a $2,600.00 loan, $75.00 of which consisted of an origination fee. Hayes thus received $2,525.00 in cash. Western Sky charged interest on the $2,525.00 at an annual rate of 139.12%. This rate compelled Hayes to make monthly payments of $294.46 over the four-year life of the loan. All told, Hayes was set to pay $14,093.12 for his $2,525.00. J.A. 152-53. The other named plaintiffs in this case received loans with terms that were just as bad or worse -- one of the loans came with an annual interest rate of 233.84%. J.A. 159, 166.

No one appears to seriously dispute that Western Sky's payday loans violated a host of state and federal lending laws. Indeed, a quick glance at Western Sky's loan agreement suggests that Western Sky was keenly aware of the dubious nature of its trade. The agreement provides that it is **subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe.** J.A. 152 (emphasis in original). It later states that

"no other state or federal law or regulation shall apply to this Loan Agreement." J.A. 152.

Despite Western Sky's best efforts, the law -- or at least the threat of the law -- caught up with it. A stream of private litigation and public enforcement actions seems to have led Western Sky to stop issuing new loans in 2013.

Unfortunately, however, the financial and legal problems wrought by Western Sky persisted. After issuing a loan, Western Sky's practice was to transfer the loan to an assortment of allied servicing and collection firms. In this case, Western Sky transferred Hayes's loan to WS Funding, LLC, which then named its corporate parent, CashCall, Inc., as the servicing agent. Sometime later, WS Funding transferred Hayes's loan to an entity called Consumer Loan Trust, which in turn named Delbert as the servicing agent. The loans issued to the other named plaintiffs in this case followed a similar path. While Western Sky was owned by a tribal member, Delbert claimed no tribal ownership or affiliation.

Delbert's debt-collection operation raised questions of its own. The plaintiffs claim that Delbert sent them collection notices without disclosing its identity as a debt collector or the identity of the actual creditor. They also allege that Delbert used an automatic dialing system to make several calls a week and sometimes multiple calls a day to their homes.

Hayes filed a putative class action in the Eastern District of Virginia to obtain relief from Delbert's allegedly unlawful collection practices. Specifically, Hayes claimed that Delbert's notices and phone calls violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p, and the Telephone Consumer Protection Act, 47 U.S.C. § 227. Hayes also sought declaratory relief to the effect that the loan agreement's forum selection and arbitration provisions were unenforceable.

The loan agreement contains a number of notable provisions. Most pertinent to this case, the agreement names a tribal forum and then purports to disavow the authority of all state or federal law. As noted above, the agreement provides:

> **This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.** By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation. J.A. 152 (emphasis in original).

Another section confirms the disavowal of state and federal law. That section, titled "**GOVERNING LAW**," states in pertinent part:

> Neither this Agreement nor Lender is subject to the laws of any state of the United States of America. By executing this Agreement, you hereby expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation. You also expressly agree that this Agreement shall be subject to and construed in accordance only

with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement. J.A. 154.

Much of the rest of the loan document concerns the arbitration agreement between Western Sky, the loan servicer, and the borrowers. The main provision of that agreement states that "any dispute [the borrower] ha[s] with Western Sky or anyone else under this loan agreement will be resolved by binding arbitration." J.A. 154. Another provision says that the arbitration will be "conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." J.A. 155. Moreover, the arbitration agreement states that it covers "any claim based upon marketing or solicitations to obtain the loan and the handling or servicing of [the borrower's] account whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement." J.A. 155.

Other provisions of the arbitration agreement mirror portions of the underlying loan agreement in that they purport to disavow the application of all state and federal law. One provision states that the agreement "IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE

7

CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." J.A. 156. Another provision of the arbitration agreement confirms that the arbitrator will not apply "any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement." J.A. 155.

A final noteworthy provision of the arbitration agreement says that the borrower "shall have the right to select" the American Arbitration Association ("AAA"), Judicial Arbitration and Mediation Services ("JAMS"), or another organization to "administer the arbitration." J.A. 155. This provision was not present in earlier versions of the Western Sky arbitration agreement. And although there is some dispute on this point, Appellant's Br. at 22, it seems as if the provision was added by Western Sky to compensate for the fact that the tribal arbitration mechanism set out in the agreement proved in practice to be illusory.

Relying on these various terms, Delbert filed a motion to dismiss, claiming that the loan agreement's forum selection clause along with the doctrine of tribal exhaustion barred Hayes and the other plaintiffs from suing Delbert in federal court.

Delbert argued as well that the loan agreement's arbitration provisions required arbitration of the dispute.

The district court ruled that Delbert could not enforce the loan agreement's forum selection clause, and that the doctrine of tribal exhaustion did not apply to the parties' controversy. But the district court agreed with Delbert that it could enforce the arbitration agreement. The court acknowledged that the tribal arbitration mechanism established by the arbitration agreement had "proved problematic," and that other courts involved in Western Sky-related litigation had accordingly "voided the arbitration agreement." J.A. 268. The court then noted, however, that the agreements in those cases did not allow the "parties to choose arbitrators and dispute rules" other than those provided by the Tribe. J.A. 268. In contrast, the parties in this case had "recourse to well-recognized arbitration organizations," including AAA and JAMS, and this "save[d] the arbitration agreement from meeting the same fate" as the earlier Western Sky agreement. J.A. 268. The district court thus issued an order compelling arbitration.

Hayes and the other plaintiffs appeal the order compelling arbitration. Delbert conditionally appeals the orders declining to enforce the forum selection clause and denying the applicability of tribal exhaustion. On appeal, and certainly at oral argument, the parties focused heavily on the issue of the

9

dispute's arbitrability, and we too now address this central question.

## II.

### A.

We review de novo a district court's order compelling arbitration under the FAA. Seney v. Rent-A-Center, Inc., 738 F.3d 631, 633 (4th Cir. 2013). In undertaking this review, we remain cognizant of the "strong federal policy in favor of enforcing arbitration agreements." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 (1985).

The FAA confers near plenary authority on an arbitrator to resolve a dispute given to him by an arbitration agreement. For this authority to be validly exercised, however, any agreement purporting to give a dispute over to arbitration must itself be valid. The validity of an arbitration agreement is a "question of arbitrability" and, in the normal course, it "is undeniably an issue for judicial determination." Peabody Holding Co. v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 102 (4th Cir. 2012) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)).[1]

---

[1] Consistent with arbitration's contractual nature, parties may give arbitrability questions to an arbitrator. This practice, however, cuts against the normal rule that these questions are for the court. Accordingly, a court must find by "clea[r] and unmistakabl[e]" evidence that the parties have chosen to give arbitrability questions to an arbitrator. Rent-A-
(Continued)

10

The specific statutory basis for our review comes from the FAA's second section, which says that an agreement "to settle by arbitration a controversy thereafter arising . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Importantly, any grounds given for revocation must concern the validity of the arbitration agreement in particular, not simply the validity of the underlying contract as a whole. Rent-A-Ctr., 561 U.S. at 70 (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403–404 (1967)). Hayes and his co-plaintiffs raise several related challenges to the arbitration agreement.

B.

The first challenge involves a bit of history. The plaintiffs claim that the arbitration agreement is unenforceable because it sets up a hollow arbitral mechanism. They note that the agreement provides that arbitration "shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized

---

Ctr., W., Inc. v. Jackson, 561 U.S. 63, 69 n.1 (2010) (alterations in original) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). Delbert argues that the parties in this case clearly and unmistakably delegated arbitrability questions, including questions regarding the validity of the arbitration agreement, to arbitration. We find, however, that Hayes and his co-plaintiffs have challenged the validity of that delegation with sufficient force and specificity to occasion our review. See id. at 71-72.

11

representative in accordance with its consumer dispute rules." J.A. 155. Other courts reviewing a Western Sky arbitration agreement very similar to the one in this case have determined that, "[a]lthough th[is] contract language contemplates a process conducted under the watchful eye of a legitimate governing tribal body, a proceeding subject to such oversight simply is not a possibility." Jackson v. Payday Financial, LLC, 764 F.3d 765, 779 (7th Cir. 2014), cert. denied, 135 S. Ct. 1894 (2015). The plaintiffs here take up this line of argument.

Specifically, the plaintiffs claim that the Tribe has no authorized representatives who conduct arbitrations, and that the Tribe does not even possess a method through which it might select and appoint such a person. In fact, one official from the Tribe has acknowledged that the tribal "governing authority does not authorize Arbitration" and the tribal court "does not involve itself in the hiring of an arbitrator." Id. at 770 n.10 (quoting letters from tribal magistrate Mona R. Demery). Delbert does not appear to contest these points. Indeed, in other litigation involving another Western Sky arbitration agreement, CashCall, Inc. (one of Western Sky's allied firms, as noted above) "acknowledge[d] that the arbitral forum and associated procedural rules set forth in [the plaintiff's] loan agreement are not available." Williams v. CashCall, Inc., 92 F. Supp. 3d

12

847, 851–52 (E.D. Wis. 2015), appeal docketed, No. 15-2699 (7th Cir. Aug. 12, 2015).

The plaintiffs are quick to point out, moreover, that in at least one Western Sky dispute that made it to arbitration, the appointed arbitrator was a Mr. Chasing Hawk. But Mr. Chasing Hawk later admitted that Western Sky's owner had asked him to arbitrate the dispute. Inetianbor v. CashCall, Inc., 962 F. Supp. 2d 1303, 1308 (S.D. Fla. 2013). Evidence in that litigation was also put forward suggesting that Mr. Chasing Hawk's daughter worked for Western Sky. Id. at 1306.

Hayes and his co-plaintiffs argue that the problems stemming from the lack of a reputable arbitrator or arbitral appointment authority are compounded by the total absence of the "consumer dispute rules" contemplated by the arbitration agreement. J.A. 155. The plaintiffs note that several federal courts have found that the rules alluded to by the agreement "do not exist." Inetianbor v. CashCall, Inc., 768 F.3d 1346, 1354 (11th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015); see also Heldt v. Payday Fin., LLC, 12 F. Supp. 3d 1170, 1190 (D.S.D. 2014). According to the plaintiffs, these grave infirmities in the arbitral mechanism collectively render the arbitration agreement "a sham from stem to stern," Jackson, 764 F.3d at 779, and thus unenforceable.

Delbert counters by pointing out that the bulk of the plaintiffs' arguments (and the court decisions accepting those arguments) are based on an older version of the Western Sky arbitration agreement, one that is materially different from the agreement entered into by Hayes and the other plaintiffs in this case. And that material difference is the provision allowing the borrower to select either AAA or JAMS -- both well respected arbitral organizations -- to administer the arbitration. J.A. 155. According to Delbert, this addition to the agreement resolves the problems resulting from the Tribe's lack of a valid arbitrator appointment process and consumer dispute rules. By working within the AAA or JAMS systems, a potential claimant would avoid the problems associated with the arbitral mechanism set out in earlier versions of the agreement. As noted above, the district court ultimately agreed with Delbert on this point, and ordered arbitration on that basis. J.A. 268.

The plaintiffs respond in turn that the simple addition of the AAA or JAMS provision cannot save the agreement. It is, they say, beyond patching up. Chief among the plaintiffs' arguments is that the AAA or JAMS provision merely allows AAA or JAMS to "administer" the arbitration, not actually conduct it. Therefore, according to the plaintiffs' reading of the agreement, some unknown "authorized representative" of the Tribe still must conduct the arbitration, and that person may rely on

14

AAA or JAMS rules only "to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate." J.A. 155.

Needless to say, how one might reconcile the lately added AAA or JAMS provision with the rest of the arbitration agreement presents a "conundrum." Heldt, 12 F. Supp. 3d at 1191. It is not immediately clear, for instance, whether an AAA- or JAMS- appointed arbitrator would still need to be an authorized representative of the Tribe, or when and how the Tribe's law or the various convoluted provisions in the agreement would override the AAA or JAMS default rules.

But institutions like AAA and JAMS excel at solving these sorts of conundrums, and once the court finds that the parties agreed to assign their dispute to arbitration, it typically is for the arbitral authority to sort out both the major and minor details of how the arbitration will proceed. It is likely for this reason that the FAA largely leaves judicial review of questions concerning the basic fairness and function of an arbitral mechanism for the award enforcement stage. See 9 U.S.C. 10; Hooters of Am., Inc. v. Phillips, 173 F.3d 933, 941 (4th Cir. 1999). Nevertheless, given the present agreement's outright rejection of the application of federal law to resolve the plaintiffs' federal claims, which we discuss below, we need not

15

consider whether the agreement is invalid on the separate basis that the dispute resolution mechanism it establishes has inconsistencies that are apparently contradictory in substance.

## C.

This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims. We note at the onset that, while Western Sky was a tribal-owned entity, Delbert is not. Accordingly, Delbert does not attempt to ground its renunciation of federal law in any claim of tribal affiliation. Both in its briefing and during oral argument, Delbert understandably did not contend that it was a tribal entity and therefore not subject to the authority of federal law on that basis.

Instead, Delbert seeks to avoid federal law through the prospective waiver of federal law provision found in the arbitration agreement. But that provision is simply unenforceable. With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away. The just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce.

16

The Supreme Court has repeatedly upheld arbitration agreements that give an arbitrator authority to arbitrate federal statutory rights. E.g., CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 673 (2012) (CROA claims arbitrable); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35 (1991) (ADEA claims arbitrable); Mitsubishi Motors Corp. v. Soler-Chrysler-Plymouth, Inc., 473 U.S. 614, 640 (1985) (federal antitrust claims arbitrable); see also Santoro v. Accenture Fed. Servs., LLC, 748 F.3d 217, 224 (4th Cir. 2014) (various federal employment claims arbitrable). Absent a "contrary congressional command," causes of action involving statutory rights are every bit as arbitrable as private contractual disputes. CompuCredit Corp., 132 S. Ct. at 669 (quoting Shearson/Am. Exp. Inc. v. McMahon, 482 U.S. 220, 226 (1987)).

Relatedly, the Court has upheld arbitration agreements that contain waivers providing that arbitration is to proceed on an individual rather than a class action basis, and that impose other procedural requirements on potential claimants. E.g., Am. Exp. Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2312 (2013) (waiver of class arbitration permissible); Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 541 (1995) (arbitration in foreign countries permissible); see also Muriithi v. Shuttle Exp., Inc., 712 F.3d 173, 181-83 (4th Cir. 2013) (fee splitting between the parties to an arbitration may

17

be permissible). These decisions flow naturally from the "overarching principle" of the FAA -- "that arbitration is a matter of contract" and, therefore, that "courts must 'rigorously enforce' arbitration agreements according to their terms." Am. Exp. Co., 133 S. Ct. at 2309 (quoting Dean Witter Reynolds Inc., 470 U.S. at 221).

Yet while the Court has affirmed that the FAA gives parties the freedom to structure arbitration in the way they choose, it has repeatedly cautioned that this freedom does not extend to a "substantive waiver of federally protected civil rights" in an arbitration agreement. 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 273 (2009). In its American Express decision, the Court first acknowledged that the prohibition of substantive waivers of federal rights may prevent the imposition of "large arbitration costs [that] could preclude a litigant . . . from effectively vindicating her federal statutory rights." Am. Exp. Co., 133 S. Ct. at 2311 (alteration in original) (quoting Green Tree Financial Corp.–Ala. v. Randolph, 531 U.S. 79, 90 (2000)); see also Muriithi, 712 F.3d at 181 (noting that an arbitration clause may be unenforceable if high arbitration costs effectively prevent access to the arbitral forum). But the Court then clarified that the substantive waiver prohibition does not go so far as to guarantee a procedural path that would make proving a federal statutory claim in arbitration "worth the

18

expense involved" for all claimants under all circumstances. See Am. Exp. Co., 133 S. Ct. at 2311-12. Rather, the Court explained, the primary aim of the prohibition is to "prevent [a] 'prospective waiver of a party's right to pursue statutory remedies.'" Id. at 2310 (emphasis in original) (quoting Mitsubishi Motors Corp., 473 U.S. at 637 n.19). The Court thus upheld the class arbitration waiver in American Express, because the waiver only reduced the economic incentive to bring a federal antitrust claim. It did not prevent a party from pursuing an antitrust claim altogether. In fact, the Court stated that the rule against substantive waivers "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights." Id.

That sort of outright prohibition is exactly what we have here. It goes well beyond the more borderline cases involving mere disincentives to pursue arbitral relief. As the plaintiffs point out, the arbitration agreement here almost surreptitiously waives a potential claimant's federal rights through the guise of a choice of law clause.[2] In the section entitled "Applicable Law and Judicial Review" the arbitration agreement provides that it "IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN

---

[2] Delbert claims that the plaintiffs waived this argument by not raising it before the district court. We disagree and find that it was a "theory plainly encompassed by the submissions" made below. Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 604 (4th Cir. 2004).

19

COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." J.A. 156. Another section of the arbitration agreement confirms that, no matter where the arbitration occurs, the arbitrator will not apply "any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement." J.A. 155. Instead of selecting the law of a certain jurisdiction to govern the agreement, as is normally done with a choice of law clause, this arbitration agreement uses its "choice of law" provision to waive all of a potential claimant's federal rights.

A party to an arbitration agreement may of course agree to waive certain rights as part of that agreement. To give just one example, the waiver of "the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate." Sydnor v. Conseco Fin. Servicing Corp., 252 F.3d 302, 307 (4th Cir. 2001) (quoting Pierson v. Dean, Witter, Reynolds, Inc., 742 F.2d 334, 339 (7th Cir. 1984)). So long as such waivers pass the applicable knowing and voluntary standard, they will typically be enforced. See id. at 306-07. Moreover, parties are free within bounds to use a choice of law clause in an arbitration agreement to select which local law will govern the arbitration. See Rota-McLarty v. Santander Consumer USA, Inc., 700 F.3d 690,

20

697 n.7 (4th Cir. 2012). These provisions often bring a welcome measure of predictability and thus efficiency to the dispute resolution process. But a party may not underhandedly convert a choice of law clause into a choice of no law clause -- it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject. See Kristian v. Comcast Corp., 446 F.3d 25, 48 (1st Cir. 2006); Hadnot v. Bay, Ltd., 344 F.3d 474, 478 n.14 (5th Cir. 2003); Graham Oil Co. v. ARCO Products Co., a Div. of Atl. Richfield Co., 43 F.3d 1244, 1248 (9th Cir. 1994), as amended (Mar. 13, 1995). Because the arbitration agreement in this case takes this plainly forbidden step, we hold it invalid and unenforceable.

Moreover, we do not believe the arbitration agreement's errant provisions are severable. It is a basic principle of contract law that an unenforceable provision cannot be severed when it goes the "essence" of the contract. 8 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 19:73 (4th ed. 1993). Here, the offending provisions go to the core of the arbitration agreement. It is clear that one of the animating purposes of the arbitration agreement was to ensure that Western Sky and its allies could engage in lending and collection practices free from the strictures of any federal law.

And although our focus must be on the arbitration agreement, not the underlying loan agreement, it is only natural

21

for us to interpret the arbitration agreement in light of the broader contract in which it is situated. As noted above, provisions in the loan agreement starkly proclaim that "no United States state or federal law applies to this Agreement." J.A. 154. The brazen nature of such statements confirms that Western Sky's arbitration agreement is little more than an attempt "to achieve through arbitration what Congress has expressly forbidden." Graham Oil Co., 43 F.3d at 1249. Good authority counsels that severance should not be used when an agreement represents an "integrated scheme to contravene public policy." Id. (quoting E. Allan Farnsworth, Farnsworth on Contracts § 5.8, at 70 (1990)). We thus decline to sever the provisions here.

## III.

We recognize that the FAA establishes a "liberal federal policy favoring arbitration agreements." Home Buyers Warranty Corp. v. Hanna, 750 F.3d 427, 436 (4th Cir. 2014) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983)). But rather than use arbitration as a just and efficient means of dispute resolution, Delbert seeks to deploy it to avoid state and federal law and to game the entire system. Perhaps in the future companies will craft arbitration agreements on the up-and-up and avoid the kind of mess that Delbert is facing here. We reverse the order of the district

22

court compelling arbitration and remand the case for further proceedings consistent with this opinion.[3]

REVERSED AND REMANDED

---

[3] As noted, Delbert had argued that the controversy should proceed solely in tribal court, and that the doctrine of tribal exhaustion forbade plaintiffs from bringing their claims in federal court in the first instance. The district court rejected both of Delbert's arguments on this score. It noted that the forum selection clause could not be enforced by Delbert because the "plain language of the forum selection clause does not reach Delbert, a third party debt collector." Mem. Op. at 4, J.A. 265. And it determined that the doctrine of tribal exhaustion did not apply because "the conduct at issue in this action did not involve an Indian-owned entity, did not occur on the [Tribe's] reservation, and did not threaten the integrity of the [T]ribe." Mem. Op. at 6, J.A. 267. We find no fault with the court's ruling on these points and adopt the reasons set forth in the district court's opinion.