Joshua PARNELL, Plaintiff,

v.

CASHCALL, INC., Defendant.

CIVIL ACTION FILE NO.:
4:14-CV-0024-HLM

United States District Court,
N.D. Georgia, Rome Division.

Signed March 14, 2016

Christopher Neil Armor, Armor Law, LLC, Atlanta, GA, James W. Hurt, Jr., Hurt, Stolz, LLC, Athens, GA, for Plaintiff.

Austin K. Brown, Jennifer Z. Gindin, Joseph L. Barloon, Skadden Arps Slate Meagher & Flom LLP, Washington, DC, Brian Jason Fischer, Neil M. Barofsky, Katya Jestin, Jenner & Block LLP, New York, NY, Erin McGarry Moore, Nancy H. Baughan, William J. Holley, II, Parker, Hudson, Rainer & Dobbs, LLP, Atlanta, GA, for Defendant.

## ORDER

Harold L. Murphy, UNITED STATES DISTRICT JUDGE

This case is before the Court on Defendant CashCall, Inc.'s ("Defendant")[1] Motion to Compel Arbitration and Stay or Dismiss Proceedings ("Motion to Compel") [54].[2]

---

1. Plaintiff originally filed this action against Defendant, Western Sky Financial, LLC ("Western Sky"), and Martin A. ("Butch") Webb ("Webb"). (Compl. (Docket Entry No. 1–2) at 1.) On February 17, 2016, the Court granted Plaintiff's Motion to Dismiss Western Sky and Webb from this action without prejudice. (Order of Feb. 17, 2016 (Docket Entry No. 66).) Defendant CashCall, Inc. is the lone remaining defendant in this action, and the Court refers to it as "Defendant."

2. On February 2, 2016, Plaintiff filed Plaintiff's Motion to Amend Amended Complaint. (Docket Entry No. 55.) On March 2, 2016, Plaintiff withdrew that Motion. (Docket Entry No. 69.) The Court therefore does not address it.

## I. Procedural Background

The Court incorporates the procedural background portions of its April 28, 2014, Order into this Order as if set forth fully herein, and adds only those procedural background facts that are relevant to the instant Motion. (Order of Apr. 28, 2014 (Docket Entry No. 25).) On April 28, 2014, the Court issued an Order that denied Defendant's Motion to Compel Arbitration and Defendant's Motion to Dismiss Based on Forum Non Conveniens. (Id.) Defendant appealed the denial of its Motion to Compel Arbitration, and, on October 28, 2015, the United States Court of Appeals for the Eleventh Circuit issued an Order reversing and remanding that denial. (Docket Entry No. 40.)[3] On December 1, 2015, the Eleventh Circuit issued its mandate. (Docket Entry No. 41.)

On that same day, the Court issued an Order making the Eleventh Circuit's mandate the judgment of this Court. (Order of Dec. 1, 2015 (Docket Entry No. 43).) On December 2, 2015, the Court issued an Order vacating the portion of the April 28, 2014, Order denying Defendant's Motion to Compel Arbitration. (Order of Dec. 2, 2015 (Docket Entry No. 44).) The Court directed Plaintiff to notify the Court within twenty-one days concerning whether Plaintiff intended to seek leave to amend his Complaint to challenge the delegation provision of the arbitration agreement. (Id. at 2-3.) The Court also directed that Plaintiff file his Motion for Leave to Amend, along with an accompanying brief and a copy of the proposed Amended Complaint, within that same twenty-one day period. (Id. at 3.)

On December 23, 2015, Plaintiff filed a Motion to Amend. (Docket Entry No. 45.)

On January 14, 2016, the Court granted that Motion. (Order of Jan. 14, 2016 (Docket Entry No. 47).) On that same day, Plaintiff filed his Second Amended Complaint. (Docket Entry No. 48.) Plaintiff asserted a claim for violation of the Georgia Payday Lending Act, O.C.G.A. § 16–17–2. (Second Am. Compl. (Docket Entry No. 48) ¶¶ 129-50.)

On January 28, 2016, Defendant filed its Motion to Compel. (Docket Entry No. 54.) The briefing processes for that Motion is complete, and the Court finds that the matter is ripe for resolution.

## II. Discussion

### A. Plaintiff's Allegations

#### 1. The Parties

Plaintiff resides in Tunnel Hill, Georgia. (Second Am. Compl. ¶ 7.) Defendant is a California corporation with its principal place of business in Anaheim, California. (Id. ¶ 22.) Plaintiff alleges that Defendant "transacts business in Georgia ... by offering, originating, and servicing ..., and collecting payments on payday loans to consumers in Georgia." (Id. ¶ 24.) Plaintiff further asserts that Defendant "has not registered with the Georgia Secretary of State and is not authorized to transact business in Georgia." (Id. ¶ 25.)

#### 2. Defendant's Business

According to Plaintiff, Western Sky makes "personal, unsecured loans over the internet to consumers in Georgia and throughout the United States." (Second Am. Compl. ¶ 28.) Plaintiff alleges that "[c]onsumers apply for small loans or payday loans through a call center, [Defen-

---

3. Defendant attempted to appeal the denial of its Motion to Dismiss Based on Forum Non Conveniens. (Docket Entry No. 31.) The Court granted leave for Defendant to file an interlocutory appeal of that decision. (Order of May 29, 2014 (Docket Entry No. 36).) The appellate court, however, denied Defendant permission to file an interlocutory appeal of that decision. (Docket Entry No. 38.)

dant's] website, or www.westernsky.com." (Id. ¶ 29.)

According to Plaintiff, Defendant "provides website hosting and support services for Western Sky," and "reimburses Western Sky for all costs of maintenance, repair and/or update costs associated with Western Sky's server." (Second Am. Compl. ¶ 30.) According to Plaintiff, Defendant "reimburses Western Sky for its office, personnel, and postage and provides Western Sky with a toll free telephone and fax number." (Id. ¶ 31.) Defendant also allegedly "provides an array of marketing services to Western Sky, including but not limited to creating and distributing print, internet, television, and radio advertisements and other promotional materials." (Id. ¶ 32.)

Once an application for a loan is received, Defendant "reviews the application for underwriting requirements." (Second Am. Compl. ¶ 33.) Once the application is approved, "Western Sky executes a promissory note and debits a so-called 'Reserve Account' to fund the promissory note." (Id. ¶ 34.) According to Plaintiff, "[t]he Reserve Account is a demand-deposit bank account set up in the name of Western Sky which carries a balance equal to the full value of two days[' worth of] promissory notes calculated on the previous month's daily average." (Id. ¶ 35.) Under an agreement between Western Sky and WS Funding, Defendant must "set up, fund, and maintain the balance in the Reserve Account," and "[t]he initial balance in the Reserve Account must be $100,000." (Id. ¶ 36.)

According to Plaintiff, "[a]fter a loan is funded, [Defendant] is obligated by agreement to purchase the promissory note from Western Sky." (Second Am. Compl. ¶ 37.) Plaintiff alleges that the agreement between WS Funding and Western Sky "provides that Western Sky can debit the Reserve Account in payment for these pur-

chased promissory notes at the end of every business day." (Id. ¶ 38.) Although "[t]he timeframe for when the purchase occurs is not specified in any agreement," Plaintiff alleges that "consumer complaints indicate that [Defendant] generally makes contact with the consumer within one business day of the consumer filing an application for the small loan or payday loan." (Id. ¶ 39.) Western Sky does not accept consumer payments for the notes. (Id. ¶ 40.)

According to Plaintiff, "[a]s compensation for services provided, Western Sky pays [Defendant] 2.02% of the face value of each approved and executed loan transaction plus any additional charges with a net minimum payment of $100,000 per month." (Second Am. Compl. ¶ 41.) Plaintiff also alleges that "in consideration for the terms of the agreement setting up the Reserve Account, [Defendant] agrees to pay Western Sky 5.145% of the face value of each approved and executed loan credit extension and/or renewal." (Id. ¶ 42.) Defendant also "pays Western Sky a minimum monthly administration fee of $10,000." (Id. ¶ 43.)

According to Plaintiff, under an agreement, Defendant "agrees to indemnify Western Sky for all costs arising or resulting from any and all civil, criminal, or administrative claims or actions, including but not limited to fines, costs, assessments, and/or penalties which may arise in any jurisdiction." (Second Am. Compl. ¶ 44.) Defendant also has responsibility "for tracking all consumer complaints regarding these payday and small loans and notifying Western Sky of these complaints." (Id. ¶ 45.)

According to Plaintiff, Defendant, Western Sky, and Webb "have taken substantial steps to conceal this business scheme from consumers and state and federal regulators." (Second Am. Compl. ¶ 46.) Plaintiff contends that Western Sky "does not

identify its relationship with [Defendant] or WS Funding on its website or in any marketing materials." (Id. ¶ 47.)

Plaintiff alleges that "[t]he promissory notes identify the 'lender' as Western Sky with an address of Timber Lake, South Dakota." (Second Am. Compl. ¶ 48.) Plaintiff further contends that "[t]he promissory notes state that the loan agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." (Id. ¶ 49 (internal quotation marks and citation omitted).)

Plaintiff alleges that although "Western Sky holds itself out to the public as a stand alone tribal entity which provides small loans and payday loans to consumers," that is not the case in reality. (Second Am. Compl. ¶ 50.) Specifically, Plaintiff alleges that Defendant: (1) "creates all advertising and marketing materials for Western Sky and reimburses Western Sky for administrative costs" (id.); (2) "reviews consumer applications for underwriting requirements" (id. ¶ 51); (3) "funds the loans" (id. ¶ 52); and (4) "services the loans" (id. ¶ 53). According to Plaintiff, "Western Sky does not receive any payment from consumers for the loans." (Id. ¶ 54.)

Plaintiff alleges that "[a]fter detailed review of [the above-described] business scheme, the New Hampshire Department of Banking concluded that Western Sky is nothing more than a front to enable [Defendant] to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators." (Second Am. Compl. ¶ 55.) Plaintiff contends that Webb is the sole owner and operator of Western Sky, and that Western Sky is Defendant Webb's alter ego. (Id. ¶ 56.)

Western Sky's website "advertises and offers a variety of loan products, including loans of $850.00, $1,500.00, and $2,600.00." (Second Am. Compl. ¶ 57.) Those "loans have annual percentage rates ('APRs') of approximately 140% to 343% and initial fees of $75.00 to $500.00." (Id. ¶ 158.) The loans require that payments be "made in monthly installments, and the length of the loan[s] ranges from twelve (12) to forty-seven (47) months." (Id. ¶ 59.)

According to Plaintiff, "Georgia consumers interested in obtaining a loan from Western Sky complete an online application via Western Sky's website or call an advertised toll-free telephone number to apply." (Second Am. Compl. ¶ 60.) Once Western Sky receives an application, it transfers the application to Defendant for underwriting. (Id. ¶ 61.) Once Defendant approves the application, it "disburses the loan funds by electronically transmitting money to the consumer's bank account located in Georgia." (Id. ¶ 62.) According to Plaintiff, "[a]s part of the loan application process, 'Defendants' require that Georgia consumers authorize 'Defendants' to electronically debit funds from the Georgia consumer's bank account for the scheduled monthly installment payments, which are then taken from the Georgia consumer's same bank account in Georgia." (Id. ¶ 63.) Plaintiff alleges that all of Defendant's "operations occur outside of the boundaries of any lands currently recognized by the United States government as belonging to the Sioux Tribe." (Id. ¶ 64.) Defendant funds all the loans that Western Sky and Webb offer and make to Georgia consumers, and it "electronically transmits the loan proceeds to the consumer's bank account in Georgia once the loan is approved." (Id. ¶ 65.)

Defendant, Western Sky, and Webb are not licensed under the Georgia Industrial Loan Act (the "GILA") to engage in consumer lending in Georgia, and Plaintiff contends that they are not exempt from GILA. (Second Am. Compl. ¶ 66.) Accord-

ing to Plaintiff, "[t]he interest rates on [the] loan products exceed the allowable interest rate of 10% that may be charged by licensed lenders under GILA." (Id. ¶ 67.) Plaintiff further alleges that Defendant, Western Sky, and Webb are not banks or thrifts chartered under federal law (id. ¶ 68), that they are not banks chartered under other state's laws (id. ¶ 69), and that they are not insured by the Federal Deposit Insurance Corporation (the "FDIC") (id. ¶ 70).

According to Plaintiff, although Western Sky "operates within the boundaries of the Cheyenne River Sioux Reservation, Western Sky is not an arm of the Sioux Tribe." (Second Am. Compl. ¶ 74.) "The Sioux Tribe does not have any ownership interest or operating role in Western Sky." (Id. ¶ 75.) According to Plaintiff, "Webb is a member of the Sioux Tribe, but he is not a tribal official and does not operate his lending business in any official tribal capacity." (Id. ¶ 76.)

Defendants require that consumers applying for loans electronically sign a loan agreement titled the "Western Sky Consumer Loan Agreement" (the "Loan Agreement"). (Second Am. Compl. ¶ 71.) The Loan Agreement states that Western Sky is the lender for the Loan. (Id.) The Loan Agreement also provides, in relevant part:

> This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation. By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law of [sic] regulation shall apply to this Loan Agreement, its enforcement or interpretation. You also expressly agree

that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement.

(Id. ¶ 72.) The Loan Agreement also contains an arbitration clause that states, in relevant part, "any dispute you have with Western Sky or anyone else under this loan agreement will be resolved by binding arbitration ... which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." (Id. ¶ 73.)

### 3. Plaintiff's Loan

In approximately June 2012, while located in Georgia, Plaintiff saw a television advertisement for Western Sky and its website. (Second Am. Compl. ¶ 77.) According to Plaintiff he "had recently completed his service with the United States Army and was in a financially complicated period, so he was interested in the short-term loans being advertised." (Id. ¶ 78.)

Using a computer located in Georgia, Plaintiff accessed www.westernsky.com and completed and submitted an online application for a loan. (Second Am. Compl. ¶ 79.) Within ten minutes after submitting his online loan application, Plaintiff received a phone call from a representative of Western Sky or Defendant, who stated that Plaintiff had been approved for a $1,000.00 loan, (Id. ¶ 80.) The representative told Plaintiff "to check his email for a document which would request his digital signature." (Id. ¶ 81.) Plaintiff received a document titled "Western Sky Consumer Loan Agreement" dated June 6, 2012 (the "Parnell Loan Agreement"). (Id.)

The Parnell Loan Agreement states, in relevant part:

[Plaintiff] further agree[s] that you have executed the Loan Agreement as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.

(Second Am. Compl. ¶ 82.) The Parnell Loan Agreement stated that Plaintiff would receive a $1,000 loan, pay a prepaid finance/origination charge of $500.00, and pay interest of 149.00 percent per annum. (Id. ¶ 83.) The Truth in Lending Act Disclosure Statement for the Parnell Loan Agreement further states that the annual percentage rate is 232.99 percent, the finance charge is $3,905.56, and that the total payments are $4,905.56. (Id. ¶ 84.) The Parnell Loan Agreement provided for Plaintiff to make an initial payment of $149.00 by July 1, 2012, followed by twenty-four monthly payments of $198.19 beginning on August 1, 2012. (Id. ¶ 85.)

Plaintiff digitally signed the Parnell Loan Agreement. (Am. Compl. ¶ 86.) Within seventy-two hours, Plaintiff received a $1000.00 direct deposit into his Georgia bank account. (Id.)

In June 2012, Plaintiff received a notice from Defendant indicating that Defendant was servicing the loan, and that Plaintiff should make all his payments to Defendant. (Am. Compl. ¶ 87.) Plaintiff made all his payments to Defendant. (Id. ¶ 88.)

According to Plaintiff, the arbitration provision contained in the Parnell Loan Agreement is void and unenforceable because: (1) although the provision requires that arbitration "shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules," (Second Am. Compl. ¶ 107), in actuality, "[n]o rep-resentative of the Cheyenne River Sioux Tribe is authorized to conduct arbitration" (id. ¶ 108); (2) the Cheyenne River Sioux Tribe has no consumer dispute rules (id. ¶ 109); (3) the provision "requires arbitration in an exclusive and non-existent forum and is therefore unenforceable" (id. ¶ 111); and (4) the provision "expressly prohibits any statutory remedies under any federal or state law to any borrower who elects arbitration" (id. ¶ 115). Plaintiff also challenges the delegation provision of the Parnell Loan Agreement, which "requires that, 'any Dispute, except as provided below, will be resolved by arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.'" (Id. ¶ 117.) Plaintiff alleges that "[t]he delegation provision requires disputes as to the validity, enforceability, or scope of the Arbitration agreement to be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules" (id. ¶ 120), but, in actuality, "[n]o representative of the Cheyenne River Sioux Tribe is authorized to conduct arbitration," (id. ¶ 121), and the tribe has no consumer dispute rules (id. ¶ 122). According to Plaintiff, "[t]he delegation provision requires arbitration in an exclusive and non-existent forum and is therefore unenforceable." (Id. ¶ 124.) Further, Plaintiff argues that the delegation provision is void because it "requires disputes as to the validity, enforceability, or scope of the Arbitration agreement to be conducted in Arbitration solely under the law of the Cheyenne River Sioux Tribe, thus expressly waiving any federal statutory rights of any borrower who challenges the validity, enforceability, or scope of the Arbitration agreement." (id. ¶ 126.)

## A. Arbitration Provision

The Parnell Loan Agreement states, in relevant part:

> **This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.** By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.
>
> You further agree that you have executed the Loan Agreement as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.

(Parnell Loan Agreement (Docket Entry No. 54–2) at 1 (emphasis in original).) The Parnell Loan Agreement also provided:

> **GOVERNING LAW.** This Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America. By executing this Agreement, you hereby expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation. You also ex-

pressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement. You agree that by entering into this Agreement you are voluntarily availing yourself of the laws of the Cheyenne River Sioux Tribe, a sovereign Native American Tribal Nation, and that your execution of this Agreement is made as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.

(Id. at 2 (emphasis and capitalization in original).)

The Parnell Loan Agreement also contained an arbitration provision, which stated, in relevant part:

> **WAIVER OF JURY TRIAL AND ARBITRATION.**
>
> **PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.** Unless you exercise your right to opt-out of arbitration in the manner described below, any dispute you have with Western Sky or anyone else under this loan agreement will be resolved by binding arbitration. Arbitration replaces the right to go to court, including the right to have a jury, to engage in discovery (except as may be provided in the arbitration rules), and to participate in a class action or similar proceeding. In Arbitration, a dispute is resolved by an arbitrator instead of a judge or jury. Arbitration procedures are simpler and more limited than court procedures. Any Arbitration will be limited to the dispute between yourself and the holder of the Note and will not be part of a class-wide or consolidated arbitration proceeding. **Agreement to Arbitrate.** You agree that any Dispute, except as provided below,

will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

**Arbitration Defined.** Arbitration is a means of having an independent third party resolve a Dispute. A "Dispute" is any controversy or claim between you and [Defendant] Western Sky or the holder or servicer of the Note. The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, including events that occurred prior to the opening of this Account), based on any legal or equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought (i.e. money, injunctive relief, or declaratory relief). A Dispute includes, by way of example and without limitation, any claim based upon marketing or solicitations to obtain the loan and the handling or servicing of my account whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement. For purposes of this Arbitration agreement, the term "the holder" shall include Western Sky or the then-current note holder's employees, officers, directors, attorneys, affiliated companies, predecessors, and assigns, as well as any marketing, servicing, and collection representatives and agents.

**Choice of Arbitrator.** Any party to a dispute, including a Holder or its related third parties, may send the other party written notice by certified mail return receipt requested at the address appearing at the top of this Agreement of their intent to arbitrate and setting forth the subject of the dispute along with the relief requested, even if a lawsuit has been filed. Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association ...; JAMS ...; or an arbitration organization agreed upon by you and the other parties to the Dispute. The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate, including the limitations on the Arbitrator below. The party receiving notice of Arbitration will respond in writing by certified mail return receipt requested within twenty (20) days. You understand that if you demand Arbitration, you must inform us of your demand and of the arbitration organization you have selected. You also understand that if you fail to notify us, then we have the right to select the arbitration organization. Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Cheyenne River Sioux Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement.

**Cost of Arbitration.** We will pay the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the Arbitration. Except where otherwise provided by the law of the Cheyenne River Sioux Tribal Nation, each party will be responsible for its own attorneys' fees and other ex-

penses. Unless prohibited by law, the arbitrator may award fees, costs, and reasonable attorneys' fees to the party who substantially prevails in the Arbitration.

**Waiver of Rights.** YOU HEREBY AGREE THAT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL, TO HAVE A COURT DECIDE YOUR DISPUTE, TO PARTICIPATE IN A CLASS ACTION LAWSUIT, AND TO CERTAIN DISCOVERY AND OTHER PROCEDURES THAT ARE AVAILABLE IN A LAWSUIT. The arbitrator has the ability to award all remedies available by statute, at law, or in equity to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual disputes between the parties. The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide Arbitration is to be determined solely by a court of competent jurisdiction located within the Cheyenne River[ ] Sioux Tribal Nation, and not by the arbitrator. If the court refuses to enforce the class-wide Arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide Arbitration, the parties agree that the Dispute will proceed in tribal court and will be decided by a tribal court judge, sitting without a jury, under applicable court rules and procedures.

**Applicable Law and Judicial Review.** THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement.

The arbitrator must apply the terms of this Arbitration agreement, including without limitation the waiver of class-wide Arbitration. The arbitrator will make written findings and the arbitrator's award may be filed in the Cheyenne River Sioux Tribal Court, which has jurisdiction in this matter. The Arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by a court upon judicial review.

**Small Claims Exception.** All parties, including related third parties, shall retain the right to seek adjudication in a small claims tribunal in the Cheyenne River Sioux Tribal Small Claims Court for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal, shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**Other Provisions.** This Arbitration provision will survive (i) termination or changes in this Agreement, the Account, or the relationship between us concerning the Account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of my Note, or any amounts owed on my account, to any other person or entity. This Arbitration provision benefits and is binding upon you, your respective heirs, successors and assigns. It also benefits and is binding upon us, our successors and assigns, and related third parties. The Arbitration Provision continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy. The Arbitration Provision survives any termination, amendment, expiration, or performance of any transaction between you and us and contin-

ues in full force and effect unless you and we otherwise agree in writing. If any of this Arbitration Provision is held invalid, the remainder shall remain in effect.

**Right to Opt Out.** If you do not wish your account to be subject to this Arbitration Agreement, you must advise us in writing ..., or via e-mail.... You must clearly print or type your name and account number and state that you reject Arbitration. You must give written notice; it is not sufficient to telephone us. We must receive your letter or e-mail within sixty (60) days after the date your loan funds [sic] or your rejection of Arbitration will not be effective. In the event you opt out of Arbitration, any disputes hereunder shall nonetheless be governed under the laws of the Cheyenne River Sioux Tribal Nation.

(Parnell Loan Agreement at 3-5 (emphasis and capitalization in original).)

## B. Applicable Law

The Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") generally governs a motion to compel arbitration. 9 U.S.C. § 2 provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

■ Courts must conduct a two-step inquiry when deciding whether to compel arbitration. Klay v. All Defendants, 389 F.3d 1191, 1200 (11th Cir.2004). First, the Court must determine whether the parties

agreed to arbitrate the dispute. Id. The Court must make that determination " 'by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].' " Id. (alteration in original) (quoting Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). The Court also must undertake that inquiry "against the background of a 'liberal federal policy favoring arbitration agreements.' " Id. (quoting Moses H. Cone Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). The United States Court of Appeals for the Eleventh Circuit, however, has cautioned that "arbitration is a matter of contract [and] the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." Id.

■ Second, the Court must determine "whether 'legal constraints external to the parties' agreement foreclosed arbitration.' " Klay, 389 F.3d at 1200 (quoting Mitsubishi Motors Corp., 473 U.S. at 628, 105 S.Ct. 3346). The party challenging enforcement of an arbitration agreement bears the burden of establishing a defense to the enforcement of the agreement. Inetianbor v. CashCall, Inc., 923 F.Supp.2d 1358, 1362 (S.D.Fla.2013).

■ The FAA generally governs the validity of an arbitration agreement; however, state law generally governs whether an enforceable contract or agreement to arbitrate exists. Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1368 (11th Cir.2005); Honig v. Comcast of Ga. I. LLC, 537 F.Supp.2d 1277, 1283 (N.D.Ga.2008). "Thus, in determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts." Caley, 428 F.3d at 1368. "[A]

court can decline to enforce an arbitration agreement under the FAA only if the [party opposing arbitration] can point to a generally applicable principle of contract law under which the agreement could be revoked." Id. at 1371. "If all the provisions of the arbitration clause are enforceable, then the court must compel arbitration according to the terms of the agreement." Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327, 1331 (11th Cir. 2005).

## C. Application to This Case

As an initial matter, the FAA applies to the arbitration provision, because the loan at issue involved interstate commerce. See Jenkins v. First Am. Cash Adv. of Ga., LLC, 400 F.3d 868, 874–75 (11th Cir.2005) (concluding that payday loan transactions involved interstate commerce; transactions occurred between Georgia resident and bank located in South Dakota).[4] The Court further finds that the claim set forth in Plaintiff's Second Amended Complaint constitutes a dispute, as defined within the arbitration provision. Consequently, if the arbitration provision is valid, then Plaintiff ordinarily would have to proceed to arbitration.

"The FAA 'provides a remedy to a party seeking to compel compliance with an arbitration agreement.'" Jenkins, 400 F.3d at 876 (quoting Prima Paint Corp. v. Flood & Conklin Mfg.Co., 388 U.S. 395, 403, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)). "Such a party can move the district court for an order compelling arbitration." Id. "Section four of the FAA instructs the district court to grant the motion and order arbitration once it is satisfied 'that the making of the agreement for arbitration ... is not in

issue.'" Id. (quoting 9 U.S.C. § 4). If, however, the making of the arbitration agreement is in question, then the federal court may first adjudicate that issue." Id.

When interpreting Section 4 of the FAA, "the Supreme Court has distinguished between claims that challenge the contract generally and claims that challenge the arbitration provision itself." Jenkins, 400 F.3d at 876. Indeed, in Prima Paint, a plaintiff sought to rescind a contract, arguing that it was fraudulently induced. Prima Paint, 388 U.S. at 398, 87 S.Ct. 1801. The defendant attempted to invoke the agreement's arbitration clause. Id. at 398–99, 87 S.Ct. 1801. The Supreme Court noted: "[I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally." Id. at 403–04, 87 S.Ct. 1801. Thus, the Supreme Court held that "in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." Id. at 404, 87 S.Ct. 1801. Consequently, because the plaintiff's fraudulent inducement claim related to the underlying contract generally, not to the arbitration clause specifically, the arbitrator, rather than the federal court, had to resolve that claim. Id. at 406, 87 S.Ct. 1801. Further, the Eleventh Circuit has held that if "'claims of adhesion, unconscionability, ... and lack of mutuality of obligation pertain to the contract as a whole, and not to the arbitration provision alone, then

---

4. GILA's provision stating that payday lending does not involve interstate commerce does not change that result. Jenkins, 400 F.3d at 875 n. 6 (citing O.C.G.A. § 16–17–1(d).) Instead, "[c]ourts determine whether or not in-

terstate commerce exists under the FAA on a case-by-case analysis by examining whether the transaction in question turns out, in fact, to have involved interstate commerce." Id.

these issues should be resolved in arbitration.'" Jenkins, 400 F.3d at 877 (quoting Benoay v. Prudential–Bache Secs., Inc., 805 F.2d 1437, 1441 (11th Cir.1986)).

 Here, Plaintiff not only challenges as unconscionable the enforceability of the arbitration agreement itself, but also challenges the so-called delegation provision of the arbitration agreement specifically.[5] (See Second Am. Compl. ¶¶ 107-116 (specifically challenging the arbitration provision"), ¶¶ 117-128 (specifically contending that the delegation provision of the arbitration agreement is void and unenforceable).) A delegation provision, in this context, is one in which the parties give the arbitrator the sole authority to resolve disputes about the enforceability of an arbitration agreement. Rent–A–Ctr., W., Inc. v. Jackson, 561 U.S. 63, 71, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010). If the party seeking to avoid arbitration does not challenge the delegation provision specifically, the provision must be enforced under the FAA, leaving enforcement disputes for the arbitrator to decide, Id. at 72, 130 S.Ct. 2772; see also Parnell, 804 F.3d at 1148 ("Because the Loan Agreement contains a delegation provision, we only retain jurisdiction to review a challenge to that particular provision. Absent a direct challenge, we must treat the delegation provision as valid and allow the arbitrator to determine the issue of arbitrability.").

 Here, contrary to Defendant's arguments, Plaintiff has made a specific, and proper, challenge to the delegation provision. (Second Am. Compl. ¶¶ 117-128.) Because Plaintiff specifically challenges the delegation clause in the Parnell Loan Agreement, the Court may determine whether the delegation provision is unconscionable. Rent–A–Ctr., W., Inc., 561 U.S. at 70, 130 S.Ct. 2772 ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other .... The question before us, then, is whether the delegation provision is valid under § 2.").

 As the Court concluded in its April 28, 2014, Order, the Cheyenne River Sioux Tribal Court would not have subject matter jurisdiction to entertain this action. (Order of Apr. 28, 2014, at 36-44.)[6] The Court also found that the chosen forum was the result of fraud or overreaching, (Id. at 32–35.) As the Court noted:

As an initial matter, the forum-selection clause is not the product of arms'-length negotiations. Defendants themselves placed the forum-selection clause into the Parnell Loan Agreement and instructed Plaintiff to sign it in order to receive his loan.

5. The Parnell Loan Agreement requires that "any Dispute ... will be resolved by arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." (Parnell Loan Agreement at 3-4.) The Parnell Loan Agreement defines a dispute as "any controversy or claim between you and Western Sky or the holder or servicer of the Note," and states that a dispute includes "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement." (Id. at 4.) The Eleventh Circuit has recognized that this "plain language con-

tains an express delegation provision," and "unambiguously commits to the arbitrator the power to determine the enforceability of the agreement to arbitrate." Parnell v. CashCall, Inc., 804 F.3d 1142, 1147–48 (11th Cir.2015).

6. C.f. Jackson v. Payday Fin., LLC, 764 F.3d 765, 768 (7th Cir.2014) ("[T]ribal courts have a unique, limited jurisdiction that does not extend generally to the regulation of nontribal members whose actions do not implicate the sovereignty of the tribe or the regulation of tribal lands.") (citing Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008)).

Moreover, the factual background statements set forth in the Parnell Loan Agreement are blatantly false, including the contentions that Plaintiff executed the Loan Agreement as if Plaintiff "were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation" and the contention that the Agreement was "fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation." (Mot. Dismiss Ex. A (Docket Entry No. 2–2).) Plaintiff's Complaint alleges that the advertisements for the loans occurred in Georgia, Plaintiff applied for the loan with his computer located in Georgia, and the money transfers occurred between Plaintiff in Georgia and Defendants in California and South Dakota.

Third, it is clearly apparent that Defendants included the forum-selection clause in the Parnell Loan Agreement in bad faith-as a means of discouraging borrowers from pursuing legitimate claims or as a means to escape regulation by state agencies. Liles [v. Ginn–La West End, Ltd.], 631 F.3d [1242,] 1254 n. 19 [ (11th Cir.2011) ]. Indeed, the New Hampshire Banking Department observed: "[I]t appears that [Defendant] Western Sky is nothing more than a front to enable [Defendant] CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators." (Am. Compl. Ex. B at 5.) The Court declines to reward Defendants' efforts.

(Id. (footnote omitted).) The Court also previously found that the Cheyenne River Sioux Tribe "does not have any consumer dispute rules" and that "[w]ithout such rules, it is obvious that arbitration cannot be conducted in accordance with [Tribal]

consumer dispute rules as required by the arbitration agreement." (Id. at 74–75) (quoting Inetianbor v. CashCall, Inc., 962 F.Supp.2d 1303, 1309 (S.D.Fla.2013 (alteration in original)).)

The choice of forum in the arbitration provision, however, clearly was an integral part of that provision. See Inetianbor v. CashCall, Inc., No. 13–60066–CIV, 2013 WL 1325327, at *3–4 (S.D.Fla. Apr. 1, 2013) (concluding that selection of Cheyenne River Sioux Tribe as arbitrator was integral to agreement to arbitrate). Under those circumstances, the failure of the chosen forum precludes arbitration. See id. at *1 ("[I]f the choice of forum is an integral part of the agreement to arbitrate, rather than an ancillary logistical concern, [then] the failure of the chosen forum [will] preclude arbitration." (second and third alterations in original) (internal quotation marks and citation omitted)). Here, the Parnell Loan Agreement's repeated references to the governing law and jurisdiction of the Cheyenne River Sioux Tribe demonstrate that the choice of forum is integral to the agreement and cannot be severed.

The fact that the arbitration provision contained an opt out clause makes no difference. Even if Plaintiff had opted out of arbitration, the opt out provision makes clear that any disputes would still be governed by the laws of the Cheyenne River Sioux Tribe (Parnell Loan Agreement at 5) and that the Agreement "is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe" (id. at 1). Thus, the opt-out provision, while initially appearing helpful, does not resolve many of the key difficulties with the Parnell Loan Agreement. Even if the opt out provision indicated a lack of fraud, the Court would still find the arbitration provision unenforceable because it is unconscionable and the selected forum is unavailable.

Moreover, other courts have determined that arbitration provisions in similar con-

tracts are unenforceable. In <u>Inetianbor v. CashCall, Inc.</u>, 962 F.Supp.2d 1303, 1309 (S.D.Fla.2013), the court declined to enforce a similar arbitration provision, noting:

> At the August 16, 2013 hearing, Cash-Call conceded that, while the [Cheyenne River Sioux] Tribe has rules concerning consumer relations—e.g. usury statutes-it does not have any consumer dispute rules. Without such rules, it is obvious that arbitration cannot be conducted in accordance with [Tribal] consumer dispute rules as required by the arbitration agreement. Accordingly, the Court concludes that Plaintiff has provided new evidence demonstrating that 1) the arbitral forum does not exist, and 2) rules governing the purported forum do not exist.

<u>Id.</u> (second alteration in original) (internal quotation marks and footnote omitted). The Eleventh Circuit affirmed that ruling, holding that the forum selection provision was integral to the loan agreement and finding the selected forum—the Cheyenne River Sioux Tribe—unavailable. <u>See</u> <u>Inetianbor v. CashCall, Inc.</u>, 768 F.3d 1346, 1353–54 (11th Cir.2014) ("We, like the District Court, understand the arbitration agreement to require the Tribe's involvement.... Finally, the fact that the arbitration clause calls for the arbitration to be conducted according to consumer dispute resolution rules that do not exist supports the conclusion that the Tribe is not involved in private arbitrations.").

As in <u>Inetianbor</u>, the Parnell Loan Agreement states that any arbitration "shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consum-er dispute rules and the terms of this Agreement." (Parnell Loan Agreement at 4–5.) The Parnell Loan Agreement therefore requires the involvement of the tribe, and such chosen forum remains unavailable. <u>See</u> <u>Inetianbor</u>, 768 F.3d at 1353 ("We can think of no other reasonable interpretation of the provision for arbitration 'by' the Tribe before an 'authorized representative' of the Tribe than one requiring some direct participation by the Tribe itself.").

The fact that the arbitration provision in the Parnell Loan Agreement may allow the Parties to select the American Arbitration Association, JAMS, or another arbitration proceeding to administer the arbitration does not change this result. That provision is limited by the statement that the chosen arbitration organization's rules and procedures will apply only "to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate." (Parnell Loan Agreement at 5.) Plaintiff is correct in his assertion that the provision does not allow a choice of arbitrator-only a choice of an arbitration administrator. Moreover, as there is no access to the alleged Cheyenne River Sioux Tribal law, there is no way that one could determine whether AAA rules or JAMS rules in any way contradict Cheyenne River Sioux Tribal law. <u>See</u> <u>Jackson</u>, 764 F.3d at 778 ("The Tribe has neither a set of procedures for the selection of arbitrators nor one for the conduct of arbitral proceedings. Consequently, it was not possible for Plaintiffs to ascertain the dispute resolution processes and rules to which they were agreeing.").[7] The fact that the Parnell

---

7. Defendant also relies on <u>Chitoff v. CashCall, Inc.</u>, No. 0:14–CV–60292, 2014 WL 6603987 (S.D.Fla. Nov. 17, 2014), in which the United States District Court for the Southern District of Florida granted a motion to compel arbi-tration because the plaintiff failed to present any evidence at an evidentiary hearing demonstrating that the Cheyenne River Sioux Tribe was unavailable as an arbitration forum. <u>Chitoff</u> thus distinguished itself from

Loan Agreement's arbitration provision included language that the Tribe's laws trumped the rules of the arbitration organizations, when those Tribal laws clearly did not and do not exist, buttresses the Court's earlier conclusion that the agreement was the product of fraud and overreaching.

Even if the chosen arbitration organization's rules of procedure would govern in an arbitration proceeding, it is unclear what substantive law would govern at an arbitration between Plaintiff and Defendant. AAA and JAMS only supply procedural rules. The Parnell Loan Agreement, however, clearly states that the laws of the Cheyenne River Sioux Tribe govern the agreement. (See Parnell Loan Agreement at 4-5) ("THIS ARBITRATION PROVISION ... SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." (capitalization in original).) As an initial matter, it is not clear that the Tribe even has any laws governing the enforceability of contracts. The Parnell Loan Agreement thus leaves Plaintiff with little to no ability to determine what substantive law would govern the Agreement at an arbitration, even if the dispute resolution rules of an arbitration organization can govern the conduct of the arbitration proceeding itself.

In the Court's previous Order, the Court concluded that the provision allowing the selection of AAA or JAMS or another organization "does not allow a choice of arbi-

trator—only a choice of an arbitration administrator." (Order of Apr. 28, 2014, at 76.) Defendant contends that the better reading of the Parnell Loan Agreement is that the arbitrator does not have to be a tribal representative, and that the Parties instead can select an arbitrator from AAA or JAMS as an alternative.

Since the Court issued that Order, several other district courts addressing the same question of interpretation of Western Sky Arbitration agreements have split over which interpretation to adopt. Some district courts have adopted Defendant's reading of the contract. See e.g., Yaroma v. Cashcall, Inc., 130 F.Supp.3d 1055, 1063–65 (E.D.Ky.2015) (enforcing arbitration provision similar to the one in the Parnell Loan Agreement); Kemph v. Reddam, No. 13 CV 6785, 2015 WL 1510797, at *5–6 (N.D.Ill. Mar. 27, 2015) (same); Williams v. CashCall, Inc., 92 F.Supp.3d 847, 854 (E.D.Wis.2015) (concluding that the borrower "has the option of choosing to arbitrate any claims that he has relating to his agreement before the AAA, JAMS, or another mutually acceptable organization, applying the consumer dispute rules of the selected administering organization and conducted by an arbitrator from the selected organization's system" who would use substantive Tribal law); Hayes v. Delbert Servs. Corp., No. 3–14–cv–258, 2015 WL 269483, at *4 (E.D.Va. Jan. 21, 2015) (distinguishing Inetianbor and Jackson and holding that "the parties have recourse to well-recognized arbitration organizations and their procedures"), rev'd, 811 F.3d 666(4th Cir.2016).[8] Another federal district

---

Inetianbor, in which the plaintiff actually attempted to arbitrate through the Cheyenne River Sioux Tribe. The Chitoff decision constitutes only persuasive authority for the Court. Because the Eleventh Circuit found in Inetianbor that the Cheyenne River Sioux Tribe was an unavailable arbitration forum after the plaintiff in that case attempted to arbitrate his claims, the Court declines to follow the reasoning in Chitoff.

8. The arbitration agreement in Inetianbor contained a different choice of arbitrator paragraph than the Parnell Loan Agreement, as it specifically required either a Tribal Elder or members of the Tribal council serve as the arbitrator. The arbitration agreement at issue in Jackson contained the same provision from these earlier versions of Western Sky's loan agreements. Jackson, 764 F.3d at 769.

court concluded that the language in the newer Western Sky arbitration agreements is inconsistent, presenting the court with a "conundrum," as there is no evidence that any "authorized representative" of the Cheyenne River Sioux Tribe is also an arbitrator for either AAA or JAMS. Heldt v. Payday Fin., LLC, 12 F.Supp.3d 1170, 1190–91, 1193 (D.S.D.2014) (declining to reach a final decision on the enforceability of the arbitration agreement "until tribal exhaustion occurs"); see also Moses v. CashCall, Inc., 781 F.3d 63, 74–75 (4th Cir.2015) (Niemeyer, J., dissenting) (finding that provisions in the Western Sky loan agreement alternately requiring arbitration by an authorized representative of the Tribe and allowing arbitration to be administered by AAA or JAMS were contradictory).[9] Those cases are persuasive authority only.

After reviewing the record in this case and the new persuasive authority interpreting Western Sky's arbitration agreements, the Court reaffirms its earlier decision that the Parnell Loan Agreement only allows a choice of administrator for the arbitration and requires the involvement of authorized representatives of the Cheyenne River Sioux Tribe. (Order of Apr. 28, 2014, at 76.) The language of the Parnell Loan Agreement supports this conclusion, noting, "you shall have the right to select any of the following arbitration organizations to administer the arbitration." (Parnell Loan Agreement at 4.)

The AAA's Consumer Rules also support this reading of the Parnell Loan Agreement by specifying that the AAA acts as an administrator, not as an arbitra-tor. In the section titled, "About the AAA," the Consumer Rules state:

> The administrator's role is to manage the administrative aspects of the arbitration, such as the appointment of the arbitrator, preliminary decisions about where hearing might take place, and handling the fees associated with the arbitration. As administrator, however, the AAA does not decide the merits of a case or make any rulings on issues .... Because the AAA's rule is only administrative, the AAA cannot overrule or change an arbitrator's decisions or rulings.

(AAA Consumer Rules at 6 (available at https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTAGE2021425=&revision=latestreleased) (last visited Feb. 23, 2016) (emphasis added).) Additionally, the AAA Consumer Rules provide that "[a]rbitrators are neutral and independent decision makers who are not employees of the AAA." (Id. at 7.) Although the AAA will administratively appoint an arbitrator from its National Roster of Arbitrators when the parties have not appointed an arbitrator (Id. at 18), the Consumer Rules allow the parties to agree to change the rules (id. at 10). Here, the Parnell Loan Agreement states that the rules of the arbitration organization do not apply to the extent that they contradict the other terms of the Agreement. (Parnell Loan Agreement at 4.) The Eleventh Circuit has held that this very language requires the involvement of the Cheyenne River Sioux Tribe by providing that arbitration "shall be conducted by the Cheyenne River Sioux

9. In Moses, a panel of the United States Court of Appeals for the Fourth Circuit split as to whether the district court erred in failing to send the bankruptcy debtor's non-core claim against CashCall to arbitration. The other two judges found that the enforceability of the arbitration provision was not properly before the panel because the bankruptcy debtor had not raised the issue in the lower court proceedings. See generally Moses, 781 F.3d 63 (describing the enforceability of the arbitration agreement as "the 800-pound gorilla lurking in the litigation" and observing "the odiousness of CashCall's apparent practice of using tribal arbitration agreements to prey on financially distressed consumers").

Tribal nation by an authorized representative." Inetianbor, 768 F.3d at 1353. The Court therefore concludes that the Parnell Loan Agreement only allows the selection of an arbitration administrator and requires the involvement of the Cheyenne River Sioux Tribe.

At best, the varying options and lack of clarity in the Parnell Loan Agreement are contradictory and confusing. See Jackson, 764 F.3d at 778 ("[I]nconsistent language in the loan contracts, specifying both exclusive Tribal Court jurisdiction and exclusive tribal arbitration without reconciling those provisions, also ma[de] it difficult for borrowers to understand exactly what form of dispute resolution they [we]re agreeing to." (alterations in original) (internal quotation marks and citation omitted)). In the Court's earlier Order, the Court followed the findings of fact set forth in Jackson:

> Moreover, the United States District Court for the Northern District of Illinois made findings of fact indicating that the arbitration provision in a similar agreement was "merely an attempt to escape otherwise applicable limits on interest charges." Jackson v. Payday Financial, LLC, No. 11 C 9288, slip op. at 6 (N.D.Ill. Aug. 28, 2013). The court noted that "the promise of a meaningful and fairly conducted arbitration is a sham and an illusion." Id. The Court agrees with that reasoning and concludes that the arbitration provision at issue is unconscionable.

(Order of Apr. 28, 2014, at 77.) The Court sees no compelling reason to reach a different conclusion in this case.

A recent decision from the Fourth Circuit supports this conclusion. Hayes v. Delbert Servs. Corp., 811 F.3d 666 (4th Cir. 2016). In Hayes, the Fourth Circuit reversed a decision from the United States District Court for the Eastern District of Virginia compelling arbitration in a case involving a similar Western Sky loan agreement. See generally id. The Fourth Circuit concluded "that the arbitration agreement in this case is unenforceable." Id. at 668. The court observed:

> The agreement purportedly fashions a system of alternative dispute resolution while simultaneously rendering that system all but impotent through a categorical rejection of the requirements of state and federal law. The FAA does not protect the sort of arbitration agreement that unambiguously forbids an arbitrator from even applying the applicable law.

Id. Ultimately, the court concluded that the "arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims." id. at 673. The court observed:

> Delbert seeks to avoid federal law through the prospective waiver of federal law provision found in the arbitration agreement. But that provision is simply unenforceable. With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away. The just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce.

Id. at 673–74.

The court noted that the arbitration provision at issue "goes well beyond the more borderline cases involving mere disincentives to pursue arbitral relief." Hayes, 811 F.3d at 675. Instead, "the arbitration agreement here almost surreptitiously waives a potential claimant's federal rights through the guise of a choice of law clause." Id. (footnote omitted). The court reasoned:

In the section entitled Applicable Law and Judicial Review the arbitration agreement provides that it "IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." Another section of the arbitration agreement confirms that, no matter where the arbitration occurs, the arbitrator will not apply "any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement." Instead of selecting the law of a certain jurisdiction to govern the agreement, as is normally done with a choice of law clause, this arbitration agreement uses its "choice of law" provision to waive all of a potential claimant's federal rights.

A party to an arbitration agreement may of course agree to waive certain rights as part of that agreement.... So long as such waivers pass the applicable knowing and voluntary standard, they will typically be enforced. Moreover, parties are free within bounds to use a choice of law clause in an arbitration agreement to select which local law will govern the arbitration. These provisions often bring a welcome measure of predictability and thus efficiency to the dispute resolution process. But a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject. Because the arbitration agreement in this case takes this plainly forbidden step, we hold it invalid and unenforceable.

*Id.* (capitalization in original) (citations omitted).

The Fourth Circuit also noted, "we do not believe the arbitration agreement's errant provisions are severable." Hayes, 811 F.3d at 675. The court observed: "It is a basic principle of contract law that an unenforceable provision cannot be severed when it goes [to] the essence of the contract." *Id.* at 675–76 (internal quotation marks and citation omitted). In this case, the court found that "the offending provisions go to the core of the arbitration agreement," as it was "clear that one of the animating purposes of the arbitration agreement was to ensure that Western Sky and its allies could engage in lending and collection practices free from the stricture of any federal law." *Id.* at 676. The court further observed:

> [A]lthough our focus must be on the arbitration agreement, not the underlying loan agreement, it is only natural for us to interpret the arbitration agreement in light of the broader contract in which it is situated. As noted above, provisions in the loan agreement starkly proclaim that no United States state or federal law applies to this Agreement. The brazen nature of such statements confirms that Western Sky's arbitration agreement is little more than an attempt to achieve through arbitration what Congress has expressly forbidden. Good authority counsels that severance should not be used when an agreement represents an integrated scheme to contravene public policy.

*Id.* (internal quotation marks and citations omitted). Although the court recognized "that the FAA establishe[d] a liberal federal policy favoring arbitration agreements," it noted that "rather than use arbitration as a just and efficient means of dispute resolution, Delbert seeks to deploy it to avoid state and federal law and to game

the entire system." Id. (internal quotation marks and citations omitted).

Although Plaintiff does not assert federal claims for relief, the reasoning of Hayes applies with equal force here. As in Hayes, it is abundantly clear that the Parnell Loan Agreement has attempted to "convert a choice of law clause into a choice of no law clause." Hayes, 811 F.3d at 675. Those "offending provisions go to the core of the arbitration agreement" and "severance should not be used when an agreement represents an integrated scheme to contravene public policy." Id. at 676 (internal quotation marks and citation marks omitted). The Court has no doubt that the arbitration provision of the Parnell Loan Agreement, like the provision at issue in Hayes, contravenes public policy.

Based on the foregoing reasons, the Court declines to enforce the delegation provision and the arbitration provision in the Parnell Loan Agreement. The arbitral forum is unavailable, and the provisions themselves are unconscionable. The Court therefore denies Defendant's Motion to Compel.

### III. Conclusion

ACCORDINGLY, the Court **DENIES** Defendant's Motion to Compel [54].

IT IS SO ORDERED, this the 14th day of March, 2016.